**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ASHLEY EVANS, *individually and on behalf of others similarly situated*,

Plaintiff,

-against-

MACY'S, INC.,

Defendant.

Case No. 1:24-CV-08761-VEC

**MACY'S, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

Max E. Kaplan
COZEN O'CONNOR
One Liberty Square
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-4682
Facsimile: (215) 701-2282
Email: mkaplan@cozen.com

Chad D. Silker
Katharine F. Lessaris
MACY'S LAW DEPARTMENT
11477 Olde Cabin Road, Suite 400
St. Louis, MO 63141
Telephone: (314) 342-6379
Facsimile: (314) 342-6452
Chad.Silker@macys.com
kate.lessaris@macys.com

*Counsel for Defendant Macy's, Inc.*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 2

A. VPPA ........ 2

B. Plaintiff's Conclusory VPPA Allegations ........ 3

III. ARGUMENT ........ 5

A. Plaintiff's Complaint Is Filled with Conclusory Allegations and Lacks Sufficient Factual Matter to State a Plausible Claim on its Face. ........ 6

B. Electronic Games Are Not "Prerecorded Video Cassette Tapes or Similar Audio Visual Materials," and Therefore Are Not Covered Under VPPA. ........ 8

1. Electronic Games Are Not "Similar" to "Prerecorded Video Cassette Tapes." ........ 8

2. The Inclusion of Limited "Cutscenes" Do Not Render an Electronic Game "Similar" to "Prerecorded Video Cassette Tapes". ........ 11

3. The Rule of Lenity Requires Any Ambiguity Be Read Against Expanding VPPA to Include Electronic Games. ........ 14

C. Macy's Is a Marketplace for Third-Party Sellers of Electronic Games—Not a Video Tape Service Provider. ........ 15

D. Macy's Did Not "Knowingly Disclose" Plaintiff's PII Under VPPA. ........ 17

1. The Complaint Does Not Allege Disclosure of Her PII. ........ 18

2. The Complaint Does Not Allege that Macy's Possesses Plaintiff's PII. ........ 19

3. Macy's Did Not "Knowingly Disclose" PII. ........ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldana v. GameStop, Inc.*, No. 22-7063, 2024 WL 708589 (S.D.N.Y. Feb. 21, 2024) ....11, 14

*Aldana v. GameStop, Inc.*, No. 22-7063, 2024 WL 3104345 (S.D.N.Y. June 24, 2024) ....11, 12, 14

*Alexandre v. Alcon Lab'ys, Inc.*, No. 22-8859, 2024 WL 623707 (S.D.N.Y. Feb. 14, 2024) ....22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....5, 12

*Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662 (S.D.N.Y. 2015) ....21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....5

*Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-4570, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) ....22

*Buechler v. Gannett Co., Inc.*, No. 22-1464, 2023 WL 6389447 (D. Del. Oct. 2, 2023) ....21

*Cellucci v. O'Leary*, No. 19-2752, 2021 WL 242806 (S.D.N.Y. Jan. 25, 2021) (Caproni, J.) ....5, 8

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ....22

*Cenveo, Inc. v. Rao*, 659 F. Supp. 2d 312 (D. Conn. 2009) ....14

*Chutich v. Green Tree Acceptance, Inc.*, No. 88-869, 1993 WL 173813 (D. Minn. Apr. 19, 1993) ....20

*Crandon v. United States*, 494 U.S. 152 (1990) ....14

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010) ....4

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017) ....20

*Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) ....2

*Erie Ins. Co. v. Amazon, Inc.*, 925 F.3d 135 (4th Cir. 2019) ....17

*In re Facebook Internet Tracking Litig.*, 263 F.Supp.3d 836 (N.D. Cal. 2017), *rev'd in part sub nom. In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020)....................20

*Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714 (N.D. Cal. 2023)....................19

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015)....................21

*Griffith v. Steiner Williamsburg, LLC*, 760 F. Supp. 2d 345 (S.D.N.Y. 2010)....................21

*Hunthausen v. Spine Media, LLC*, 678 F. Supp. 3d 1228 (S.D. Cal. 2023)....................16, 17

*In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015)....................21, 22, 23

*In re Hulu Priv. Litig.*, No. 11-3764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012)....................11

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009)....................15

*Martin v. Meredith Corp.,* 657 F. Supp. 3d 277 (S.D.N.Y. 2023)....................18

*Martinez v. D2C, LLC*, No. 23-21394, 2024 WL 4367406 (S.D. Fla. Oct. 1, 2024)....................6, 24

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397 (S.D.N.Y. 2002)....................16

*Mendez v. Barr*, 960 F.3d 80 (2d Cir. 2020)....................15

*Mendoza v. Caesar's Entertainment, Inc.*, No. 23-3591, 2024 WL 2316544 (D.N.J. May 22, 2024)....................11, 14

*Milo & Gabby LLC v. Amazon.com, Inc.*, 693 F. App'x 879 (Fed. Cir. 2017)....................17

*Mollett v. Netflix, Inc.*, 795 F.3d 1062 (9th Cir. 2015)....................21, 23

*In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262 (3d Cir. 2016)....................9, 10

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002)....................5

*Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017)....................21

*Solomon v. Flipps Media, Inc.*, No. 22-5508, 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023)....................12, 19

*Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841 (N.D. Cal. 2022)....................12, 13

*United States v. Martinez-Santos*, 184 F.3d 196 (2d Cir. 1999)....................9

*United States v. Sylvester*, 605 F.2d 474 (9th Cir. 1979)....................21

*In re Vizio*, 238 F. Supp. 3d 1204 (C.D. Cal. 2017) ....................11, 13

*Walker v. Meta Platforms, Inc.*, No. 22-2442, 2023 WL 3607282 (N.D. Cal. Mar. 3, 2023) ....................12, 13

*Willingham v. Global Payments, Inc.*, No. 12-1157, 2013 WL 440702 (N.D. Ga. Feb. 5, 2013) ....................23

*Worix v. MedAssets, Inc.*, 869 F. Supp. 2d 893 (N.D. Ill. 2012) ....................23

**Statutes**

10 U.S.C. § 949p-5 ....................22

15 U.S.C. § 6821 ....................21

18a U.S.C. § 5 ....................21

Video Privacy Protection Act, 18 U.S.C. § 2710 .................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ....................5

Black's Law Dictionary ....................9

Oxford Learner's Dictionaries ....................10

S. Rep. No. 100-599 ....................9

Webster's Dictionary ....................9

Defendant Macy's, Inc. ("**Macy's**") respectfully submits this memorandum of law in support of its motion to dismiss ("**Motion**") the Complaint ("**Complaint**"), Doc. 1, filed by Plaintiff Ashley Evans ("**Plaintiff**") with prejudice. As set forth, the Motion should be granted.

## I. INTRODUCTION

Plaintiff brings this single cause action against Macy's for an alleged violation of the Video Privacy Protection Act ("**VPPA**"), 18 U.S.C. § 2710, related in some way to her purchase of an undisclosed electronic game on an unknown date from a third party through Macys.com, which she asserts resulted in the disclosure of unspecified personally identifiable information ("**PII**"). VPPA prohibits (i) a "video tape service provider"—i.e., one who sells or delivers "prerecorded video cassette tapes or similar audio visual materials"—from (ii) knowingly disclosing (iii) a consumer's purchase of specific video materials (iv) without consent. Plaintiff's Complaint fails as to each of these elements, and should be dismissed with prejudice.

As an initial matter, Plaintiff's allegations are wholly conclusory and conspicuously lacking in detail—including as to her actions, purchase, system setting, or any personal information allegedly at issue—and thus fail the most basic pleading requirements set forth in *Twombly* and *Iqbal*. Simply put, once one breaks through her boilerplate VPPA allegations, it is not at all clear what Plaintiff alleges Macy's has done with regard to her information, let alone where or when. It is not the role of Macy's or this Court to sift through such threadbare allegations.

Equally important, Macy's is not a "video tape service provider," as electronic games are not "prerecorded video cassette tapes" or anything "similar." The statute, case law, and legislative history agree: VPPA is a limited, penal statute repeatedly cabined by Congress to static, prerecorded videos similar to movies and television. The alleged inclusion of unidentified and undefined interstitial "cutscenes"—on which Plaintiff appears to rely—cannot transform an

inherently live, interactive, role-playing experience into something it is not. Regardless, to the extent VPPA's scope is unclear, the rule of lenity favors interpreting the statute narrowly.

Plaintiff's claim also fails because she did not make any purchase from Macy's. As her pleading betrays, Macy's did not sell or deliver any product to Plaintiff, and does not sell or deliver electronic games generally. Rather, Macy's operates as a third-party marketplace that connects a buyer with a seller, by whom the electronic game is "shipped and sold." *Id.* ¶ 37, figs. 1–3. Put differently, as Plaintiff is not a "purchaser" of any "goods" from Macy's, Macy's is not a "video tape service provider," and she is not a "consumer" under the statute.

Finally, Plaintiff fails to allege that Macy's "knowingly disclosed" her "personally identifiable information." Noticeably absent from the Complaint are (1) the disclosure of Plaintiff's "personally identifiable information," (2) Macy's possession of this information, and (3) Macy's *mens rea* to support a knowing disclosure.

Respectfully, for these and other reasons set forth, the Complaint should be dismissed with prejudice.

## II. FACTUAL BACKGROUND

### A. The Video Privacy Protection Act

VPPA is a penal statute codified under Title 18 of the U.S. Code ("Crimes and Criminal Procedure), which prohibits a "video tape service provider" from knowingly disclosing the "personally identifiable information" of a "consumer" without consent. 18 U.S.C. § 2710(b). By statute, "video tape service provider" is limited to person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." § 2710(a)(4). "Personally identifiable information," in turn, means "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." § 2710(a)(3). And the term "consumer" is defined as "any renter, purchaser, or

subscriber of goods or services from a video tape service provider." § 2710(a)(1). Failure to abide by this law may result in hefty civil penalties, punitive damages, and attorneys' fees. § 2710(c)(2).

**B. Plaintiff's Conclusory VPPA Allegations**

Plaintiff alleges that she purchased a single electronic game through Macy's website within the last two years. Complaint, Doc. 1, ¶ 6. She does not provide any details about this transaction, however, such as an approximate purchase date, or even the game's title. *See id.* Nor does she allege that she purchased or rented any videos from Macy's. Nonetheless, Plaintiff asserts in a conclusory manner that Macy's is a "video tape service provider" within the meaning of VPPA because it sold her and others unspecified "video games" that purportedly contain unspecified "cinematic cutscenes," a phrase she does not define or explain. *Id.* ¶¶ 6, 21.

Plaintiff further alleges that she "maintained and used her Facebook account from the same browser she used to purchase the video game." *Id.* ¶ 7. She does not allege, however, that she was logged into her Facebook account, from the same browser or otherwise, ***at the time*** of purchase. *Id*. And tellingly, while she allegedly "maintains a Tiktok account," she cannot and does not even allege that she used such account from the same device or browser. *Id.* Regardless, Plaintiff does not allege that these Facebook or TikTok accounts make ***her*** personal information—e.g., her real name—publicly available to the ordinary person.

Nonetheless, Plaintiff contends that Macy's violated VPPA by disclosing her and others' "Personal Viewing Information" to "Facebook, TikTok, and other [unspecified] unauthorized third parties" when they "request[ed] or purchas[ed] a video game or other audiovisual content from Defendant's Website or Apps." *Id.* ¶¶ 23, 55. Specifically, Plaintiff alleges that Macy's installs a "Facebook Pixel and related Facebook Business Tools" on its website and app, which may result in Facebook obtaining the names of specific games, along with customer's "persistent and unique" Facebook identifier. *Id.* ¶¶ 28–29, 36. She further contends that Macy's uses TikTok's pixels and

cookies, which can allegedly share similar information. *Id.* ¶¶ 33–34. Plaintiff claims she did not consent to the disclosure of her "video viewing history to third parties." *Id.* ¶ 40.

Unable to identify what Plaintiff actually purchased, or when, the Complaint contains a screenshot showing what Plaintiff claims customers see when they add a game to their online "bag." *Id.* ¶ 37, Fig. 1. A zoomed-in version of the screenshot is replicated below:




*Id.* Underneath the item title, the page identifies that it is "Shipped and sold by GameQuest," a third-party seller, and not by Macy's. *Id.*; *see also, e.g.*, *Nintendo: Super Mario Bros. RPG – Switch* ("**Super Mario Bros. RPG Page**"), Macys.com (noting that same product is currently "Shipped and sold by Pro-Distributing"), https://www.macys.com/shop/product/nintendo-super-mario-rpg-switch?ID=17327279 (click "Add To Bag") (last visited Feb. 24, 2025).[1] As described on this page, the "Product Features" of this "RPG" (i.e., role-playing game) include:

- Jump through a colorful world and give attacks some extra oomph in battle!
- Explore the vibrant environments with your party and jump towards your next goal!
- Run into monsters to enter turn-based battles with your party of three.
- Press the button at the right time for a satisfying dose of extra damage or helpful guard.

---

[1] While the URL referenced in Figures 1 through 3 is difficult to read, it appears to reference the same URL as this Super Mario Bros. RPG Page, which is therefore incorporated by reference into the Complaint and may be considered by the Court on this Motion. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Super Mario Bros. RPG Page, *supra* (click "Product Details). The user may also view on this same page the "Shipping & Return" details for the product, including that "Orders will ***not ship in Macy's packaging***," and "Returns must be mailed back ***to the seller*** within 30 days of purchase." *Id.* (emphases added).

## III. ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) requires dismissal where a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept all "factual allegations" as true, it is not required to accept mere "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," or naked assertions lacking factual enhancement. *Id.*; *accord Twombly*, 550 U.S. at 555 (holding that a plaintiff has an "obligation to provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and the formulaic recitation of the elements of a cause of action will not do").

"Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678. "[E]ven though courts are required to take all of the factual allegations in the complaint as true, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Cellucci v. O'Leary*, No. 19-2752, 2021 WL 242806, at *6, 8–10 (S.D.N.Y. Jan. 25, 2021) (Caproni, J.) (quoting *Iqbal*, 556 U.S. at 678). Where a complaint does not meet these standards, courts should not hesitate to dismiss claims where "the plaintiff's allegation . . . fails as a matter of law." *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir. 2002); *see also, e.g.*, *Cellucci*,

2021 WL 242806, at *11 (dismissing complaint with prejudice where plaintiff failed to plead "adequate factual allegations" supporting his claim).

### A. Plaintiff's Complaint Is Filled with Conclusory Allegations and Lacks Sufficient Factual Matter to State a Plausible Claim on Its Face.

Plaintiff's 59-paragraph Complaint lacks the factual content necessary to support her VPPA claim and fails to meet the *Iqbal/Twombly* standard, requiring dismissal. The bulk of Plaintiff's Complaint merely recites jurisdictional and class action standards in a conclusory manner, offers a history lesson on the VPPA's codification and the creation of certain electronic game technologies not alleged to be at issue here, and injects irrelevant details about TikTok, including allegations about its ownership, revenue, and business services that have nothing to do with Plaintiff's efforts to state a proper VPPA claim.

Meanwhile, Plaintiff does not include sufficient factual allegations to plausibly support her claim. For instance, Plaintiff vaguely alleges in Paragraph 6 that she "has purchased a video game through Defendant's Website within the last two years," but she fails to state such key (and obvious) facts as what game she purchased, when she purchased it, on what device or browser she purchased it, or whether she purchased it through Macy's website or App.[2] Similarly, while she alleges in Paragraph 7 that she "maintains" Facebook and TikTok accounts, she offers nothing regarding her account, browser, or computer settings, or any facts to support her conclusion that her experience would mirror that of the hypothetical "ordinary customer," as she claims. *See Martinez v. D2C, LLC*, No. 23-21394, 2024 WL 4367406, at *7–8 (S.D. Fla. Oct. 1, 2024) (summarizing requirements to show disclosure of PII by pixel technology). And although Plaintiff claims the untitled game she purchased contained so-called "cutscenes," she does not identify these

[2] Plaintiff references each generally in her Complaint without explanation of which one applies to her alleged purchase or whether there is any distinction between website and App users.

"cutscenes," offer any explanation as to what constitutes a "cutscene," or plead any fact to support a finding that the game actually contains "cutscenes." She certainly does not allege that the title of any "cutscene" is disclosed, which alone should be fatal to Plaintiff's claim.

Additionally fatal to her Complaint, Plaintiff fails to even put Macy's on notice of precisely what conduct she claims is proscribed by VPPA. The statute prohibits disclosure of PII to third parties—but the "disclosure" and "PII" supposedly at issue here are wholly indiscernible. As suggested proof that Macy's discloses some consumers'—but not necessarily her own—PII to third parties, she offers three Figures to illustrate what allegedly occurs when a consumer purchases an electronic game from Macy's website. *See* Complaint, Doc. 1, ¶ 37. Specifically, Figures 1–3 reflect the example of placing the Nintendo game "Super Mario Bros RPG" in an online shopping bag. *See id.* Ignoring the fact that Plaintiff does not allege that ***she*** made this actual purchase, she contends that these Figures "show how Defendant sends to Facebook and TikTok Plaintiff and Class Members PII along with the title of the video game that a customer requested or purchased through the Website." *Id.* In the caption under both Figures 2 and 3, Plaintiff then maintains that it is at the point of "attempt[ing] to purchase a video game from Defendant's Website . . . [that] the personal viewing information was transmitted to" both Facebook and TikTok. *Id.* What this "personal viewing information" comprises is mystifying.

Adding further to the confusion are allegations that consumers are somehow viewing video on Macy's website and app, which is implausible and untethered from reality, and that such "viewing information" and "video viewing history" is a VPPA disclosure. *See, e.g.*, *id.* ¶¶ 9, 40. For example, Plaintiff maintains that, while visiting the Macy's website or app, there are videos for consumers to view. *See, e.g.*, *id.* ¶ 28 (alleging there are video games "that customers requested and/or viewed each time through Defendant's Website and Apps"), ¶ 36 ("When Defendant's

customers purchase, request or *view audio visual content* on Defendant's Website . . . .") (emphasis added). That is patently untrue and not factually alleged. As her own illustrative examples make clear, Macy's is a marketplace for third-party game sellers, not a website where she could have watched or played any electronic games. *See, infra,* Section III.C.

The Court should not condone what is happening here: an attempt to obscure the facts and cobble together a vague claim built on speculation and parroted statutory language. All Plaintiff pleads in support of the elements of her claim are conclusory and formulaic statements pulled from VPPA's text and other actions. *See* Complaint, Doc. 1, ¶¶ 52–59. This Court has made clear such assertions warrant dismissal. *See Cellucci*, 2021 WL 242806, at *8–10.

### B. Electronic Games Are Not "Prerecorded Video Cassette Tapes or Similar Audio Visual Materials," and Therefore Are Not Covered Under VPPA.

Plaintiff's summary allegations also fail to state cognizable claims. On its face, VPPA does not apply to sellers of electronic games. The act regulates a "video tape service provider" which is defined as "a person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Plaintiff nonetheless summarily asserts that electronic games are "similar audio visual materials." Not so. VPPA's text, courts' interpretations of VPPA, and the statute's legislative history all confirm that electronic games do not constitute "prerecorded video cassette tapes or similar audiovisual materials," even if they contain limited "cutscenes" (which Plaintiff has not alleged beyond conclusory allegations). The Complaint must therefore be dismissed with prejudice.

#### *1. Electronic Games Are Not "Similar" to "Prerecorded Video Cassette Tapes."*

VPPA is a limited scope, penal law. Congress chose not to regulate "all" purveyors of "any" prerecorded video or "other" audio visual content. Rather, it expressly limited VPPA to providers of "prerecorded video cassette tapes" or audio visual materials "similar" to prerecorded

video cassette tapes. In the Second Circuit, "similar" is a limiting term, given its ordinary or common meaning. *See, e.g.*, *United States v. Martinez-Santos*, 184 F.3d 196, 204 (2d Cir. 1999) (noting that Webster's Dictionary defines "similar" as "having characteristics in common; very much alike; comparable"). Likewise, Black's Law Dictionary defines "similar" as "[n]early corresponding; resembling in many aspects; somewhat alike; having a general likeness." (6th ed. 1990). VPPA must, therefore, be read as cabined to media "having characteristics in common" with what was stored on "prerecorded video cassette tapes."

We do not need to guess at what this limited scope may capture, as Congress has told us. "Congress's purpose in passing [VPPA] was quite narrow." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016). Specifically, VPPA was intended to address "a video clerk leaking an individual customer's video rental history. Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *Id.* at 290; *see also id.* at 284 (Congress did not "intend for the law to cover factual circumstances removed from those that motivated its passage."). To that end, Congress enacted VPPA to keep individuals' choice of ***films and television*** to watch private. *See* S. Rep. No. 100-599, at 4 ("Protecting an individual's choice of books and films is a second pillar of intellectual freedom . . . ."); *id.* ("[A] state has no business telling a man, sitting alone in his house, what books he may read or what films he may watch."); *id.* at 5 ("[I]t is nobody's business what Robert Bork . . . watch[es] on television . . . ."). Congress subsequently reconfirmed VPPA's narrow scope when, in 2013, Congress amended VPPA to account for modern technological realities, explaining:

> At the time of the [VPPA's] enactment, consumers ***rented movies*** from video stores. The method that Americans used ***to watch videos*** in 1988 – the VHS cassette tape – is now obsolete. In its place, the Internet has revolutionized the way that American consumers rent and watch ***movies and television programs***. Today, so called "on-demand" cable services and Internet streaming services allow consumers to watch ***movies or TV shows*** on televisions, laptop computers, and cell phones.

*In re Nickelodeon*, 827 F.3d at 288 (emphasis added) (quoting S. Rep. No. 112-258, at 2 (2012)). Even then, and despite the ubiquity of electronic games, Congress remained myopically focused on prerecorded movie and television viewing, at no time mentioning electronic games or the like.

Electronic games do not have characteristics "similar" to prerecorded movies or television or anything else that may have been recorded onto a video cassette tape. When watching a prerecorded television show or movie, the consumer must merely press play on the device, and its viewing experience will be the same as all other consumers. By contrast, each electronic game user's experience is tailored to the player's actions. As Plaintiff acknowledges, electronic games are "forms of interactive entertainment" that "permit[] the viewer to not only manipulate the programming, but to interact with the material – play games, take quizzes, adjust pacing and repeat sections as desired." Complaint, Doc. 1, ¶¶ 17–18 (citations omitted). This is particularly true in "role playing games" or "RPGs"—such as the game referenced by Plaintiff—where the purpose of the genre is for "players [to] pretend to be imaginary characters who take part in adventures." *role-playing game*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/role-playing-game (last accessed Feb. 24, 2025); *see also Product Description*, Super Mario Bros. RPG Page, *supra* (in game referenced in Complaint, players "Jump through a colorful world and give attacks"; "Explore the vibrant environments"; "Run into monsters"; and "Press the button at the right time"). In this way, an electronic game—and particularly the game Plaintiff holds out as an exemplar—is far from "similar" to prerecorded movies or television, but rather represents a type of cooperative and competitive play involving active engagement, skill, knowledge, and chance, which changes in form and substance as the user engages with its content.

This Court is not the first to have encountered this issue in the context of electronic games. In *Mendoza v. Caesar's Entertainment, Inc*., the plaintiff alleged that Caesar's violated VPPA by disclosing users' PII when they played "video games" on its website, such as "virtual slots and roulette." No. 23-3591, 2024 WL 2316544, at *1 (D.N.J. May 22, 2024). The court disagreed, holding that Caesar's online "video games" were not "sufficiently akin" to video cassette tapes for the statute to apply. *Id.* at *5. In so holding, the court reasoned that, while Congress intended VPPA to apply to changing audio visual technology (such as online streaming), online "video games" are too far attenuated from the media that motivated the act's original passage. *Id.* at *4; *cf. In re Hulu Priv. Litig.*, No. 11-3764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (expanding VPPA to streaming as merely the modern conveyance of "video content"); *In re Vizio*, 238 F. Supp. 3d 1204, 1222 (C.D. Cal. 2017) (same for SmartTVs).

#### ***2. The Inclusion of Limited "Cutscenes" Do Not Render an Electronic Game "Similar" to "Prerecorded Video Cassette Tapes."***

Plaintiff nonetheless contends that Macy's is a "video tape service provider" because, purportedly, unspecified games offered at unspecified times contain unidentified "cutscenes." Complaint, Doc. 1, ¶¶ 1, 7. In this away, Plaintiff hopes to parrot the conclusion in *Aldana v. GameStop, Inc*., which ***preliminarily*** held that ***identified*** games that included ***specific*** cutscenes could ***potentially*** trigger VPPA. No. 22-7063, 2024 WL 708589 (S.D.N.Y. Feb. 21, 2024). Plaintiff's position is fundamentally flawed for a number of reasons.

First, Plaintiff offers no explanation of what constitutes a "cutscene," or the basis for her assertion that unidentified games contain such "cutscenes." Indeed, Plaintiff cannot even identify the game she purportedly purchased, rendering her allegation that it contained a "cutscene" particularly suspect and speculative. This stands in stark contrast to the complaint in *Aldana*, which included "screenshots of 'cut scenes' from two video games that Plaintiffs purchased." *Id.* at *2;

*see also Aldana v. GameStop, Inc.*, No. 22-7063, 2024 WL 3104345, at *3 (S.D.N.Y. June 24, 2024) (noting the court's "narrow holding hinged" on the nature of those cutscenes, which could subsequently be tested in discovery). By comparison, Plaintiff's "naked assertions devoid of further factual enhancement" are insufficient to state a claim. *Iqbal*, 556 U.S. at 678.

Second, Plaintiff ignores VPPA's limited, punitive reach. Courts have been careful to interpret narrowly the types of "video" captured by the statute. *See, e.g.*, *Solomon v. Flipps Media, Inc.*, No. 22-5508, 2023 WL 6390055, at *4 (E.D.N.Y. Sept. 30, 2023) ("The scope of the statute is not, however, unbounded."). For example, courts uniformly hold that VPPA does not apply to "live" video presentations—even if such presentations must be "prerecorded" in advance of viewing. *Id.*; *see also Walker v. Meta Platforms, Inc.*, No. 22-2442, 2023 WL 3607282, at *5 (N.D. Cal. Mar. 3, 2023); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022). As the plain language of the statute does not contemplate the disclosure of "live" videos, these courts reason, VPPA cannot be stretched to cover such ubiquitous records, regardless of their sensitivity.

*Walker* is instructive. There, plaintiff argued that video streamed on "Facebook Live" counts as "prerecorded" since the streaming process effectively captures video, saves the video data to a server, and then transfers the recorded video to viewers. *Walker*, 2023 WL 3607282, at *7. In rejecting this argument, the court observed that, even as described, the video was not captured as a single, cohesive relic, but was rather "streamed" in pieces to be reconstituted by the user's machine. *Id.* Put differently, to trigger VPPA, it is not enough for a piece of media to have "prerecorded video" components; rather, it must be akin to the prerecorded video content that would have been stored on a "prerecorded video cassette tapes."

This makes sense. The nominal inclusion of ***some*** prerecorded content cannot transform an otherwise "live" experience into "specific prerecorded content" covered by VPPA. Consider a

"live" sports broadcast: If the presenter interrupts the "live" feed to show a recorded "replay" of the action, is VPPA suddenly triggered? What if, for context, a presenter shows a "clip" from last week's game—does the whole event become PII under VPPA because the announcer "cut" away from the "live" action to show related material? What if the network decided weeks ago that the "clip" should be shown at halftime, and then does so—does that premeditation somehow mean the event is no longer "live"? What about prerecorded ads—do their inclusion trigger VPPA? And how about prerecorded team and athlete video introductions before sporting games—are they covered by VPPA? If the answer to any of these hypotheticals is "yes," then anyone presenting a "live" sporting event, or really any modern "live" event, could suddenly become subject to extensive and penal liability under VPPA. Courts, however, have uniformly concluded that is not the case. *See, e.g.*, *Stark*, 635 F. Supp. 3d at 851 ("[L]ive broadcasts do not fall within the definition of regulated content . . . .").

In this way, electronic games are similar to "live" pieces of entertainment. Unlike movies, television, or other on-demand video content, where each viewer will see identical content regardless of when or how the video is accessed, "cutscenes," as this Defendant understands them,[3] are interstitial segments that link together live-play action controlled by the player. They are, in their most static form, "instant replay" and other computer-generated "clips" reconstituted in real time to provide context or clarity for the otherwise "live" events of the game. In this way, Electronic games may use "cutscenes" to present each user with substantially different content in different ways and at different times based on how that player decides to play. Yet, and like the live stream in *Walker*, they are constituted and reconstituted by the user's machine as she engages with the game. Cutscenes, thus, are a piece with playing the game "live," and certainly do not alter

[3] Again, Plaintiff does not define "cutscene," requiring some degree of speculation.

a game's nature to transform it into something "similar" to a "prerecorded video cassette tape." *See In re Vizio*, 238 F. Supp. 3d at 1222 (holding that most of a list of technologies, including electronic game consoles, were "far too peripherally or passively involved in the delivery of video content to reasonably constitute 'the business' of delivering video content").

Finally, it must be noted that *Aldana* is one, non-precedential decision not followed by any other court. *Cf. Mendoza*, 2024 WL 2316544, at *4 (declining to reach *Aldana* due to insufficient facts to demonstrate the video games offered by defendant were sufficiently similar to videotapes). And indeed, *Aldana*'s discussion of legislative history misses the mark. As set forth *supra*, the legislative history makes no reference to electronic games, and instead focused on protecting an individual's privacy concerning their choice of films or television to watch. Nonetheless, *Aldana* relies upon references in the legislative records to "books" (not games) for the proposition that VPPA extends past films—despite, in the same breath, acknowledging that, ultimately, Congress intentionally removed books from the final version of the bill. 2024 WL 708589, at *5. Simply put, discussions in support of a provision ultimately rejection cannot then be used to support an expansive view of what Congress chose to keep.

***3. The Rule of Lenity Requires Any Ambiguity Be Read Against Expanding VPPA to Include Electronic Games.***

To the extent any ambiguity exists, the rule of lenity requires the statute be read narrowly. VPPA is a penal statute. It appears in Title 18 of the U.S. Code, i.e., under "Crimes and Criminal Procedure," and was codified as a criminal statute with hefty civil penalties. 18 U.S.C. § 2710(c)(2) (providing for liquidated damages of $2,500, punitive damages, and attorneys' fees). As the Supreme Court has long recognized, where, in a civil case, "the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage." *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see also*

*Cenveo, Inc. v. Rao*, 659 F. Supp. 2d 312, 316 n.3 (D. Conn. 2009) (noting rule of lenity applies to civil action under the Computer Fraud and Abuse Act, also codified under the Title 18). The rule of lenity ensures that criminal statutes will provide fair warning of what constitutes prohibited conduct, minimizes the risk of selective or arbitrary enforcement, and strikes the appropriate balance between the legislature and the court in defining liability. *Mendez v. Barr*, 960 F.3d 80, 87 (2d Cir. 2020); *see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009) (in civil action, noting that "[t]he Supreme Court has long warned against interpreting criminal statutes in surprising and novel ways that impose unexpected burdens on defendants").

Respectfully, should this Court find that VPPA ***could*** be read broadly to cover electronic games (it does not), the penal posture of the statue requires the Court to resolve such ambiguity in Macy's favor. Macy's should not face liability under a criminal Title for behavior that is not apparent from the face of the statute or otherwise.

### C. Macy's Is a Marketplace for Third-Party Sellers of Electronic Games—Not a Video Tape Service Provider.

Central to Plaintiff's claim is her allegation that Macy's is a "video tape service provider" because it purportedly "***sells*** prerecorded audiovisual materials in the form of video games," including to Plaintiff, and therefore is "a digital version of obsolete Blockbuster brick-and-mortar stores for classic and modern video game titles." Complaint, Doc. 1, ¶¶ 6, 21 (emphasis added). But as Plaintiff's Complaint betrays, that is not so.

With exceptions, VPPA makes it unlawful for a "video tape service provider" to knowingly disclose covered information of a "consumer of such provider." § 2710(b)(1). As discussed, the term "video tape service provider" is limited to persons in the business of "rental, sale, or delivery" of covered media. § 2710(a)(4). A "consumer," in turn, is a "renter, purchaser, or subscriber of goods or services from a video tape service provider." § 2710(a)(1). Thus, to assert a claim,

Plaintiff must not only show that Macy's is a "video tape service provider," i.e., that Macy's sells and delivers covered media, but also that she purchased goods or services from Macy's.

As the Complaint confirms, she did neither. To the contrary, Figures 1 through 3 of the Complaint, which Plaintiff alleges show "screenshot[s] of what a consumer sees when they attempt to purchase a video game on Defendant's Website," acknowledge that the identified product is not sold by Macy's, but rather "[s]hipped and sold by GameQuest." Complaint, Doc. 1, ¶ 37, Figs. 1–3; *see also* Super Mario Bros. RPG Page, *supra* (click "Add To Bag").[4] Indeed, had Plaintiff included images of the entirety of the page, i.e., what is viewable either before clicking "Add To Bag" or after clicking "X" to exit the "cart," she would need to concede that resulting "Orders will not ship in Macy's packaging," and "Returns must be mailed back to the seller [i.e., not Macy's] within 30 days of purchase." *See, e.g.*, Super Mario Bros. RPG Page, *supra* (click "View More" under "Product Details"). Simply put, Plaintiff's own pleading confirms that Macy's does not sell or deliver the products with which Plaintiff takes issue, to Plaintiff nor to anyone else; rather, Macy's acts as a third-party marketplace that merely fulfills orders "shipped and sold" by a non-party to this action.

At least one other court has dismissed a VPPA claim where, as here, a plaintiff made a purchase from a third-party through the named-defendant's platform. In *Hunthausen v. Spine Media*, *LLC*, plaintiff alleged that he "purchased products advertised on [d]efendant's website by third parties from which [d]efendant receives direct or indirect compensation." 678 F. Supp. 3d 1228, 1232 (S.D. Cal. 2023). As the court recognized, however, plaintiff "did not purchase anything ***directly*** from Defendant, but rather from third parties," and therefore was not a

---

4 "If a plaintiff's allegations are contradicted by [a document attached to a complaint], those allegations are insufficient to defeat a motion to dismiss." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (citations omitted).

"consumer" under VPPA. *Id.* (emphasis added). The court thus held that plaintiff failed to state a VPPA claim and dismissed the complaint without leave to amend. *Id.* at 1233.[5]

The court's decision in *Hunthausen* is bolstered by decisions outside of the VPPA context finding that Amazon, a third-party marketplace, is not a "seller" because it does not transfer title of goods to purchasers. *See, e.g.*, *Erie Ins. Co. v. Amazon, Inc.*, 925 F.3d 135, 141 (4th Cir. 2019) (dismissing products liability claim against Amazon where allegedly defective product was listed by third-party vendors on its website but sold by the third party). In *Milo & Gabby LLC v. Amazon.com, Inc.*, for example, the Federal Circuit held that Amazon did not infringe plaintiff's federal copyright rights because Amazon was not a "seller" under the Copyright Act. *See* 693 F. App'x 879, 880 (Fed. Cir. 2017). Under the Copyright Act, "one is not liable for copyright infringement unless it distributes copies of the copyrighted work 'to the public . . . by sale or other transfer of ownership.'" *Id.* at 885 (quoting 17 U.S.C. § 106(3)). The court applied the ordinary meaning of "sale" to its analysis and found that, because Amazon never held or passed title to the allegedly infringing products, it could not be a seller under the statute. *Id.* at 886. It reached this conclusion even though, unlike here, Amazon's fulfillment service "shipped [the] product to an Amazon warehouse for storage and Amazon boxed up and shipped the product when a sale was consummated on the website." *Id.*

Applying a similar plain-language approach to VPPA, Plaintiff's allegation that Macy's is a "video tape service provider," or that Plaintiff is a "consumer", because Macy's is a "seller" must fail. As in the context of copyright and products liability, merely fulfilling an order, without transferring title, is insufficient to make someone a "seller." The Complaint shows that Macy's

---

[5] This analysis extends to the definition of "video tape service provider" as well. While holding that plaintiff was not a "consumer" under the VPPA, the *Hunthausen* court acknowledged that "the scope of a 'consumer,' when read with sections 2710(b)(1) and (a)(4), is cabined by the definition of 'video tape service provider'" and that the two definitions are "paired to some degree." *Hunthausen*, 678 F. Supp. 3d at 1233.

does not sell—or even ship (i.e., deliver)—the materials at issue in this case. Thus, Plaintiff cannot establish that either she or Macy's satisfies the most basic elements of her claim.

### D. Macy's Did Not "Knowingly Disclose" Plaintiff's PII Under VPPA.

Even if Plaintiff somehow overcomes the foregoing deficiencies, she cannot plausibly allege that Macy's knowingly disclosed her PII for several reasons. First, Plaintiff does not plausibly allege any disclosure of PII. Second, Plaintiff cannot allege that Macy's possessed, let alone disclosed, her PII. Third, assuming *arguendo* that Macy's disclosed Plaintiff's PII, the Complaint does not plausibly allege that Macy's knowingly made this disclosure. For these reasons, the Complaint—buoyed by rank speculation—fails to pass muster.

#### ***1. The Complaint Does Not Allege Disclosure of Plaintiff's PII.***

Plaintiff bears the burden to show that Macy's "knowingly disclose[d]" her PII; that is, Macy's must be the entity responsible for disclosing Plaintiff's PII. § 2710(b)(1). As discussed *supra*, Plaintiff fails to put Macy's on notice of her claim by omitting critical facts such as the game she allegedly purchased, the content of that game, the title of any "cutscene," and precisely what her theory of "disclosure" of "PII" is. The confounding allegations she does provide nonetheless fail as a matter of law.

Notably, Plaintiff rests her disclosure allegations on Figures 1 through 3 of her Complaint. These figures purport to show that, at the point a consumer is "***attempt[ing]*** to purchase a video game from Defendant's Website[,] . . . personal viewing information was transmitted to" both Facebook and TikTok. Complaint, Doc. 1, ¶ 37 (emphasis added). In other words, the exemplar disclosure is of an ***attempted*** purchase of a game to third parties. But under VPPA, this is not a disclosure of PII. Instead, case law makes clear that the alleged disclosure invoking the VPPA must connect the consumer's PII to ***actual*** video viewing or purchase history, which Plaintiff does not do. *See Martin v. Meredith Corp.,* 657 F.Supp.3d 277, 284–85 (S.D.N.Y. 2023) (dismissing

complaint where defendant sent information concerning the webpage accessed, rather than disclosing plaintiff "requested or obtained specific video materials"). Indeed, more is necessary beyond visiting a webpage: "even for webpages including a video, sending the URL does not identify a person as having requested or obtained the video on that page since the person may instead have merely reviewed an article on the page or opened the page and done nothing more." *Id.* at 285. This problem for Plaintiff is conflated where, as here, it is the putative "cutscenes," which go untitled and undisclosed even in the Complaint, allegedly constitute the "specific video materials" triggering VPPA.

But even if Plaintiff had alleged the disclosure of some "specific video materials" she purchased (she does not), she still fails to allege this information was ever linked by anyone to her identifying information. Plaintiff broadly alleges that information received by Facebook through pixels includes users' Facebook IDs ("**FID**"), which an "ordinary person" can use to identify the user's Facebook public profile page. Complaint, Doc. 1, ¶¶ 30, 32. She even alleges that a Facebook profile may contain potentially identifying information, such as "name, gender, birthday," etc. *Id.* ¶ 32. Nowhere, however, does Plaintiff allege that the Facebook (or TikTok) account ***she*** allegedly maintains contains this or any other identifying information, or that such information is made public in a way as to allow an "ordinary person" the ability to identify ***her*** from an FID. *See id.* ¶ 7. Put differently, while an FID may constitute PII in some instances, Plaintiff has failed to allege facts sufficient to plausibly conclude the same here. *See Solomon*, 2023 WL 6390055, at *3 ("As her complaint says nothing about any personal information on her public Facebook profile page, her VPPA claim fails."); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) (holding "complaint does not adequately allege that their FIDs

result in the sharing of any personal information" where plaintiffs "do not allege their Facebook pages contain any personal information").

### 2. *The Complaint Does Not Allege that Macy's Possesses Plaintiff's PII.*

In addition, Plaintiff must demonstrate that Macy's possessed her PII. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (rejecting VPPA claim where defendant never possessed the information necessary to actually identify plaintiff); *Chutich v. Green Tree Acceptance, Inc.*, No. 88-cv-869, 1993 WL 173813, at *9 (D. Minn. Apr. 19, 1993) ("[A] corporation cannot disclose what it does not know . . . ."). To demonstrate this possession, Plaintiff manufactures an implausible version of the purported tracking pixels at issue. This exercise rests on pure conjecture and ignores Facebook's and TikTok's own cookie policies to make the giant leap that Macy's somehow possesses her PII to which it never had access. These gaps are far too overwhelming for this Court to ignore.

The Complaint alleges that, through tracking pixels, consumers provide their "persistent cookies containing their PII" to Macy's, which is then "transmitted to Facebook, TikTok, and other unauthorized third parties." Complaint, Doc. 1, ¶ 54; *see also id.* ¶ 23. This is a sleight of hand that overlooks the source of the cookies and what generates the PII, including Facebook and TikTok identifiers. Plaintiff's vague conclusion merely assumes that Macy's is the source of these identifiers and fails to take into account how cookies actually work. Indeed, both Facebook's and TikTok's cookie policies reflect that cookies are small pieces of text used to store information on web browsers or devices.[6] A cookie is used to identify one's computer or device while using a specific computer network and "just sits on the browser and gets sent along with information that

---

[6] *See* Facebook Cookies Policy, https://www.facebook.com/policies/cookies/ (last accessed Feb. 24, 2025); TikTok Cookies Policy, https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en (last accessed Feb. 24, 2025).

would otherwise be sent." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 142 (3d Cir. 2015); *see also In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 840 (N.D. Cal. 2017), *rev'd in part sub nom. In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020); *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1093–94 n.3 (N.D. Cal. 2015) ("A 'cookie' is a file on a user's computer.").

Stated differently, by virtue of Facebook's and TikTok's own cookies, browsers and devices are then able to cull a user's Facebook and TikTok identifiers. Fatal to the Complaint, Plaintiff does not take into consideration that ***her browser transmits this data regardless of what Macy's does***. *See, e.g.*, *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 664 (S.D.N.Y. 2015) ("[T]hrough its 'c_user' cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID."); *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017) (noting that "Facebook puts cookies on visitors' computers," such as the "c_user cookie," a "unique identifier" containing a user's FID); *accord Buechler v. Gannett Co., Inc.*, No. 22-1464, 2023 WL 6389447, at *4 (D. Del. Oct. 2, 2023) (dismissing Facebook Pixel-related VPPA claim for failure to allege that the defendant disclosed PII where the allegations "appear[ed] to establish that the subscriber-users themselves and/or Facebook—not [defendant]—implement the 'Tracking Methods' . . . that result in the disclosure of Plaintiffs' PII and Video Watching Data to Facebook"); *cf. Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066–67 (9th Cir. 2015) (rejecting VPPA claim where the alleged disclosure of PII to third parties resulted from the plaintiffs' own decision to give those parties access to their Netflix accounts).

Unable to plausibly demonstrate that Macy's is the source of her social-media identifiers, the best Plaintiff can do is allege that Macy's caused the disclosure of her PII by installing the tracking pixels on its website. Complaint, Doc. 1, ¶¶ 23–35. This falls flat. VPPA imposes liability

only on a party that "discloses" PII, not a party that simply "causes" disclosure, by some other entity, of information the defendant does not possess. *See United States v. Sylvester*, 605 F.2d 474, 475 (9th Cir. 1979) (holding that a statute reaching "one who 'causes [wildlife] to be sold in interstate or foreign commerce'" is "far more broadly worded" than if the statute applied only to a person who "sells" wildlife). When interpreting statutory language, courts must honor the precise words used and assume that Congress intended them as written. *Griffith v. Steiner Williamsburg, LLC*, 760 F. Supp. 2d 345, 355 (S.D.N.Y. 2010). And there are countless examples of Congress understanding the difference between "disclose" and "cause to be disclosed," even in the data-privacy context. *See, e.g.*, 15 U.S.C. § 6821 (prohibiting any person to "cause to be disclosed . . . customer information of a financial institution"); 18a U.S.C. § 5 ("defendant reasonably expects to disclose or to cause the disclosure of classified information"); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, or to cause the disclosure of, classified information"). Congress "knew how" to "impose . . . liability" for causing a disclosure, but under the VPPA, "it did not." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–77 (1994).

Because Plaintiff cannot show that Macy's possessed her PII, let alone disclosed it, her VPPA claim must fail. Plaintiff's misunderstanding of the technology and imprecise pleading should be ignored in favor of facts that are capable of accurate and ready determination from sources whose accuracy cannot be reasonably questioned, including publicly available information found on a website. *Alexandre v. Alcon Lab'ys, Inc.*, No. 22-8859, 2024 WL 623707, at *3 (S.D.N.Y. Feb. 14, 2024) (citing Fed. R. Evid. 201). These facts include that Facebook and TikTok's own cookies are capable of possessing Plaintiff's identifiers.

#### ***3. Macy's Did Not "Knowingly Disclose" PII.***

Finally, Plaintiff fails to plausibly allege the existence of a "knowing disclosure" by Macy's. § 2710(b)(1). "[T]he term 'knowingly' connotes actual knowledge. It is not enough . . .

that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing[.]" *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1095. In the VPPA context, "'knowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code," or that a provider had knowledge of the transmission of any code. *Id.* In other words, "[i]f [the video service provider] did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-4570, 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017).

The Complaint is deficient because it is replete with allegations that the transmittal of the social-media identifiers is contingent upon factors outside of Macy's knowledge or control. Simply put, the lawfulness of a disclosure "cannot depend on circumstances outside of [Macy's] control." *Mollett*, 795 F.3d at 1066. Plaintiff glosses over this by making vague assertions about the tracking pixels that do not align with how the technology functions. For example, Plaintiff contends that the necessary *mens rea* is inferred through Macy's choice to track its customers, its installation of code that it received from Facebook and TikTok, and its control of the information tracked, recorded, and transmitted through its website and app. Complaint, Doc. 1, ¶ 25. Yet, as demonstrated *supra*, the possession of the social-media identifiers are beyond Macy's control and possession. The reality is that Facebook and TikTok can and do possess users' identifiers and their browsing activities through their own cookies (even putting aside Macy's). And the Complaint does little to make sense of how Macy's would have knowledge that it was disclosing PII to entities already in possession of this information. Regardless, the Complaint must plausibly articulate that Macy's knew that it, rather than some other entity, was the source of this disclosure.

And there are other circumstances beyond Macy's control that the Complaint fails to fill in. As the court recognized in *Martinez v. D2C, LLC*, in order for a pixel to transmit relevant information to Meta (or TikTok), several conditions must have been met. No. 23-21394, 2024 WL 4367406, at *7 (S.D. Fla. Oct. 1, 2024). Specifically, when accessing the relevant website, and clicking the relevant prerecorded video content, the user must have also:

> (1) had a Facebook account at the time the video was selected;
>
> (2) used a web browser that didn't block the Pixel by default;
>
> (3) been simultaneously logged into the subscriber's own Facebook account while selecting the video;
>
> (4) been simultaneously logged into Facebook on the same device that the subscriber used to select the video;
>
> (5) been simultaneously logged into Facebook using the same browser through which the subscriber selected the video; and
>
> (6) not deployed any number of browser settings or add-on software that would have blocked the Pixel.

*Id.* at *7–8. Here, Plaintiff does not even allege using the same browser to make the game purchase while logged into TikTok. Without these circumstances, there would be no disclosure of PII to Facebook or TikTok, let alone that Macy's had knowledge of this disclosure.

Plaintiff cannot meet her burden by overlooking that her browser may be the source of this disclosure. Even if she somehow attributes her browser to Macy's, this is not a "knowing disclosure." As courts interpreting the Electronic Communications Privacy Act ("**ECPA**")—an analogous federal privacy statute "on which the VPPA was modeled," *In re Hulu*, 86 F. Supp. 3d at 1095—have explained, the fact that a defendant merely "contributed" to the disclosure of sensitive data by a third party is insufficient to establish that the defendant "knowingly divulge[d]" (or in the case of the VPPA, "knowingly disclose[d]") it. *Willingham v. Global Payments, Inc.*, No. 12-1157, 2013 WL 440702, at *12 (N.D. Ga. Feb. 5, 2013); *see also Worix v. MedAssets, Inc.*,

869 F. Supp. 2d 893, 896 (N.D. Ill. 2012) (concluding plaintiff failed to plausibly allege an ECPA claim based on allegations that the defendant's actions "created or contributed" to a "risk" that data would be disclosed by a third party). As "contribution" is the most Plaintiff can allege, the Complaint cannot be sustained.

## **CONCLUSION**

For the foregoing reasons, Defendant Macy's, Inc. respectfully requests that the Court grant its Motion and dismiss Plaintiff's claims with prejudice, and for such other and further relief as this court deems proper.

Dated: February 25, 2025

Respectfully submitted,

**Cozen O'Connor**

By: */s/ Max E. Kaplan*
Max E. Kaplan
One Liberty Square
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-4682
Facsimile: (215) 701-2282
Email: mkaplan@cozen.com

Chad D. Silker
Katharine F. Lessaris
Macy's Law Department
11477 Olde Cabin Road, Suite 400
St. Louis, MO 63141
Telephone: (314) 342-6379
Facsimile: (314) 342-6452
Chad.Silker@macys.com
kate.lessaris@macys.com

*Counsel for Defendant Macy's, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing.

*/s/ Max E. Kaplan*
Max E. Kaplan

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing memorandum of law is limited to 8,750 or fewer words and otherwise complies with the requirements of Rule 4(A)(i) of this Court's Individual Practices in Civil Cases.

*/s/ Max E. Kaplan*
Max E. Kaplan